IN THE UNITED STATES DISTRICT COURT,
FOR THE NORTHERN DISTRICT OF ALABAMA,
EASTERN DIVISION

NICHOLAS R. KISH,          )
an individual,             )
        Plaintiff,         )
                           )
vs.                        )    CV-03-HS-0706-E
                           )
HARLEY DAVIDSON MOTOR      )
COMPANY, a corporation,    )
and WAYNE SUMNERS,         )
an individual,             )
        Defendants.        )
                           )

**ENTERED**

**NOV - 8 2004**

## MEMORANDUM OF DECISION

### Introduction

On October 10, 2002, Nicholas R. Kish (hereafter "Plaintiff")
filed a charge of discrimination based on disability with the EEOC,
and on January 3, 2003, the EEOC issued Plaintiff a Notice of Right
to Sue.  Plaintiff filed suit against Harley Davidson and Wayne
Sumners in this court on March 28, 2003.[1]  In Count One Plaintiff
alleges Harley Davidson discriminated against him under the
Americans with Disabilities Act (hereafter "ADA") by failing to
provide him with a reasonable accommodation.  Count Two alleges
Harley Davidson wrongfully terminated Plaintiff because of his
disability in violation of the ADA.  Count Three alleges that Harley
Davidson committed fraud by promising to reimburse Plaintiff for
travel related expenses and not doing so.  Count Four alleges that

---

[1]   This case was originally assigned to Magistrate-Judge John E. Ott.
All the pleadings and evidence were filed in Judge Ott's court, and on July 6,
2004, the case was reassigned to the undersigned.



Harley Davidson's failure to promptly reimburse Plaintiff for those expenses was a breach of contract. Count Five alleges that Wayne Sumners made defamatory remarks alleging that Plaintiff kept reimbursement checks for personal use instead of paying his corporate credit card bill. Plaintiff attributes Wayne Sumners' defamatory remarks to Harley Davidson under the theory of respondeat superior.

Plaintiff invokes the jurisdiction of this court under 28 U.S.C. § 1331. Section 1331 provides jurisdiction for Counts One and Two. Though Plaintiff does not so state, it is apparent that Counts Three, Four and Five are state law claims within this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).[2]

The Court now has before it Defendants' motion for summary judgment (Doc. # 16) accompanied by supporting memorandum and evidence (Docs. # 17 & 18). Also before the Court are Plaintiff's opposition brief and evidence (Docs. # 22 & 23) and Defendant's Reply Brief (Doc. # 24). As to Counts One and Two under the ADA, the Court concludes that Plaintiff is not disabled as a matter of law and, there being no genuine issues of material fact, Defendants' motion for summary judgment is due to be granted. Regarding Counts

---

[2]   Plaintiff does not invoke the Court's diversity jurisdiction under 28 U.S.C. § 1332. However, as will become apparent, after the disposition of Counts One, Two, Three and Five, it is all but certain that the amount recoverable under the remaining Count Four is only "nominal damages," which clearly will not satisfy the amount in controversy requirement of § 1332(a). This Court will not exercise its supplemental jurisdiction over a purely state law claim for nominal amounts where the case no longer involves a federal claim.

Three and Five the Court also concludes that Plaintiff has failed to produce evidence sufficient to create a genuine issue of material fact, and the Defendants' motion for summary judgment is also due to be granted.  Because there is insufficient evidence before the Court to determine exactly what the facts are and whether a genuine dispute exists as to Count Four, and because the order hereafter to be entered will dispose of all counts over which the Court has original jurisdiction and two counts over which it has supplemental jurisdiction, the Court declines to exercise jurisdiction over that remaining count pursuant to § 1367(c)(3).  Accordingly, Count Four will be dismissed without prejudice, and Plaintiff will be free to re-file the claim in state court should he desire to do so.[3]

### Undisputed Factual Background[4]

In March of 1999, Plaintiff began working temporarily as a "test-rider" at Harley Davidson's Talladega Facility.[5]  (Def. Ex. 1

---

[3] As will become abundantly clear under this Court's analysis of Plaintiff's Count Three fraud claim, there is a total lack of evidence establishing that Plaintiff sustained any damage.  Nevertheless, the absence of such evidence does not affect Plaintiff's Count Five contract claim because, under Alabama law, "[i]t is well settled that an action will lie for breach of contract, even where the plaintiff has suffered no actual damage."  Avis Rent A Car Systems, Inc., 876 So.2d 1111, 1120 (Ala. 2003).  Thus, although Plaintiff may still seek recovery based upon breach of contract, any damage award will be nominal.  See Knox Kershaw, Inc. v. Kershaw, 556 So.2d 126, 128 (Ala. 1989).  In consideration of the foregoing and consistent with the principle of de minimis non curat lex, this Court will decline to exercise supplemental jurisdiction over Plaintiff's purely state law contract claim.

[4] Where there is a dispute, the facts, unless otherwise noted, are stated in the fashion most favorable to the Plaintiff.  Lofton v. Secretary of Dept. of Children and Family Services, 358 F. 3d 804, 809 (11th Cir. 2004).

[5] Plaintiff was employed by ATDS, a temporary employment agency, and was a "contract employee" from March of 1999 until accepting permanent employment in July of 1999.

at 150).  Several months later in July, Plaintiff was offered and accepted full-time employment as a *temporary* test-rider for Harley Davidson.[6]  (Def. Ex. 5 at 2).  After receiving the required medical approval, Plaintiff began work at Harley Davidson on September 19, 1999.  (Def. Ex. 1 at 175-179).

A test-rider rides Harley Davidson motorcycles under different conditions and subjects them to various lengths of operation.  (Def. Ex. 1 at 220).  The results from the tests are used for general research and development, as well as specific purposes, such as monitoring a particular model's EPA compliance.  (Def. Ex. 1 at 219-222).  Test-riders are required to perform regular inspections on the motorcycles and must be able to ride for extended periods of time.  (Def. Ex. 4 at 2).  Inspecting the motorcycles requires the test-rider to crouch, bend, kneel or crawl, as well as lift and move the motorcycle itself.[7]  (Def. Ex. 4 at 2).  While the majority of inspections are performed in the testing facilities, situations can arise where a test rider must inspect a motorcycle on the road during a test ride.  (Def. Ex. 4 at 2).

On October 28, 1999, Plaintiff was in a car accident resulting in injuries which prevented him from returning to work until mid-

---

[6]  The parties' exhibits do not make it clear what the exact differences between a "temporary" and a "regular" test-rider are.  However, it appears that a "temporary" test-rider accepts employment on a probationary basis and may not be eligible for the full range of employee benefits, as is a "regular" test-rider.  A "regular" test-rider is also paid more.  (Def. Ex. 1 at 194-197).

[7]  The average Harley Davidson motorcycle weighs 707 pounds with fuel and oil.  The heaviest model weighs 838 pounds with fuel and oil.  (Def. Ex. 4 at 2).

December of the same year. (Def. Ex. 1 at 190-191). Upon returning to work, Plaintiff was promoted to a full-time *regular* test-rider. (Def. Ex. 5 at 2). Because of the car accident, Plaintiff was limited to half shifts and did not resume working full shifts until August of 2000. (Def. Ex. 1 at 252). From August 2000 until February 2001, Plaintiff worked as a full-time *regular* test-rider and was not physically limited in his capacity to perform his job. (Def. Ex. 1 at 255). However, on February 16, 2000, Plaintiff strained his arm and was unable to return to work. (Def. Ex. 1 at 255). While he was still on leave because of his arm strain, Plaintiff injured his Achilles tendon and his period of leave was extended until May 21, 2001. On May 21, Plaintiff reported for duty but was informed that before resuming his job he would have to undergo a medical examination by a physician selected by Harley Davidson. (Def. Ex. 1 at 257).

Dr. Hankins, the physician selected by Harley Davidson, examined Plaintiff and concluded that his Achilles tendon injury needed further treatment, that he was unable to return to work, (Def. Ex. 1 at 259), and recommended that he not resume motorcycle testing until his injury was completely healed. (Def. Ex. B to Ex. 5). Plaintiff returned to his doctor who opined that the only further treatment for the Achilles injury was immobilization and put Plaintiff's ankle in a walking cast. (Def. Ex. 1 at 260). During this period of time Plaintiff was either completely off-duty or was

limited to light duty work.  (Def. Ex. 1 at 261).

In October 2001, Plaintiff received a letter from Wayne Sumners explaining that due to his extended absence from work his position was going to be filled by another person.  (Def. Ex. 29 to Ex. 1).[8] Plaintiff was scheduled to have knee surgery on October 31, 2001, and his doctor restricted him from lifting more than 20 pounds, squatting or kneeling, and from riding motorcycles.  (Def. Ex. 21 to Ex. 1).  After his knee surgery, Plaintiff was unable to return to work until December 6, 2001.  (Def. Ex. 22, 23, 24, 25 to Ex. 1). In December 2001, Plaintiff tried to return to work but was informed that he could not do so until he was restriction free.  (Def. Ex. 1 at 275-276).  On January 15, 2002, Plaintiff's doctor indicated that he was limited to medium work, should not lift more than 50 pounds and should not squat or kneel.  (Def. Ex. 26 to Ex. 1).

On or about December 6, 2001, when Plaintiff was first cleared to return to light duty work, he began requesting that Harley Davidson accommodate him by allowing the use of a Handy Lift[9] to help him complete his job.  (Def. Ex. 1 at 283-285).  It was made clear

---

[8]  Harley Davidson's previous policy allowed workers with health restrictions to do light duty work, even when there was no light duty work to be done.  Wayne Sumners was hired in April 2001 as Human Resources Manager and changed this policy, so that no one is to be assigned light duty work when there is no such work to be done.  Mr. Sumners also instituted the policy under which employees who are absent for four weeks or more are required to receive approval by a Harley Davidson selected physician before returning to work. (Def. Ex. 5 at 1-2).

[9]  A Handy Lift is a hydraulic lift, and Handy Lifts were used on a regular basis at the Talladega testing facility.  The Handy Lift will lift a motorcycle a maximum of 30 inches above the ground.  (Def. Ex. 4 at 2).

to Plaintiff that, as long as he was restricted in the type of work he could do, he would not be allowed to return to his job as a test-rider.  (Def. Ex. 1 at 279).  On January 21, 2002, Plaintiff met with Wayne Sumners and Mary Jane Womack, the Occupational Nurse at the Talladega testing facility.  (Def. Ex. 5 at 6).  During the meeting, Mrs. Womack and Mr. Sumners discussed four open positions which Plaintiff might be able to fill.  (Def. Ex. 5 at 6).  Of the jobs discussed, Plaintiff was either not qualified or was unable to fill the position due to his restrictions.  (Def. Ex. 5 at 6).  Plaintiff inquired about becoming a Vehicle Test Stand Operator (hereafter VTS), but he was informed that there were no open positions and that Harley Davidson had no plans to train any new VTS's.  (Def. Ex. 1 at 295).  Because Plaintiff's old position was filled, he did not return to work after his meeting with Wayne Sumners in January 2002.  Thereafter, Plaintiff received a letter dated April 18, 2002, notifying him that his employment would be permanently terminated on the 30th of the same month.  (Def. Ex. 1 at 60).

While he was still employed by Harley Davidson and working, Plaintiff traveled on business to Arizona between December 2000 and February 2001.  (Def. Ex. 5 at 2). While on these trips, Plaintiff was instructed to use his corporate credit card to cover various expenses of other Harley Davidson employees.  (Def. Ex. 1 at 450-451).  Plaintiff's supervisor faxed him reimbursement forms in Excel

format and instructed him to turn them in at the end of his trip as per company policy. (Def. Ex. 1 at 470). Plaintiff filled out the expense sheets and turned them into his supervisor as instructed. (Def. Ex. 1 at 472).

Harley Davidson issued Plaintiff a reimbursement check for $562.13 covering his expenses from December 15, 2000 - December 21, 2000. (Def. Ex. 2 at 1). In May 2001, Harley Davidson found out that this reimbursement check never cleared. While Plaintiff had endorsed the check and forwarded it directly to American Express, he failed to include the correct account information so the account was never credited. (Def. Ex. 5 at 3). Plaintiff's other expenses from his travel were not reimbursed and on April 16, 2001, the Accounts Payable department sent notice to Plaintiff informing him that his expense reports were not processed because they lacked the proper Account Distribution numbers. (Def. Ex. A to Ex. 2).[10] On May 24, 2001, Dinah Decker, an Administrative Support Specialist for Harley Davidson, sent Plaintiff a letter explaining that he had not been reimbursed because he filled out the electronic expense reports in

---

[10] Plaintiff contends that his original expense reports were never properly processed by his supervisor and that when he visited Dinah Decker's office the reports were in a folder and unsubmitted. (Def. Ex. 1 at 472). Defendants offer the affidavit of Mrs. Decker in rebuttal. Mrs. Decker attests that the reports were in fact submitted and that Plaintiff is mistaken. (Def. Ex. 2 at 3). Mrs. Decker explains that had the reports never been submitted by May 2001, the notice from the Accounts Payable Department marked Ex. A to Ex. 2 would not exist. Mrs. Decker attests that the reports were in a folder in her office only after having been rejected by the Accounting Department. (Def. Ex. 2 at 3). While the issue of whether the expense reports were ever submitted is not relevant to the issues determined herein, the Court notes that there is no evidence which suggests that the Plaintiff has personal knowledge regarding the submission of the expense reports for payment. See FED. R. EVID. 602.

handwriting.  (Def. Ex. B to Ex. 2).  At this point, Wayne Sumners asked Plaintiff to come in to work and fill out the expense reports under his supervision.  (Def. Ex. 1 at 394).

After properly filling out the expense reports, Harley Davidson reimbursed Plaintiff in June 2001, and Plaintiff endorsed the checks over to American Express as payment on his account.  (Def. Ex. 1 at 390-392).  For some reason the checks never cleared, and Harley Davidson stopped payment on the checks. (Def. Ex. 38 to Ex. 1). Wayne Sumners sent Plaintiff a letter dated September 10, 2001, explaining that the checks would be reissued and that Harley Davidson was not responsible for any late fees accrued.  (Def. Ex. 38 to Ex. 1).  The amount then owed on the American Express account, due to late fees and penalties, exceeded the amount of the reimbursement checks.  (Def. Ex. 1 at 400-401).   P l a i n t i f f eventually settled the matter with American Express in July of 2002. (Def. Ex. 1 at 375, 544).  Based upon these facts Plaintiff commenced this action.

### SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229 F.3d

1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324.

The substantive law will identify which facts are material and which are irrelevant. Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at

10

1115-17 (citing <u>U.S. v. Four Parcels of Real Property</u>, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. <u>Fitzpatrick</u>, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at

11

trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the non-moving party's case. Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### PLAINTIFF'S ADA CLAIMS

Under the ADA, employers are prohibited from discriminating against qualified individuals with disabilities

> in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a) (1991).  To make out a *prima facie* case of discrimination under the ADA, a plaintiff must show that he: 1) has a disability; 2) is qualified, with or without reasonable accommodation; and 3) was unlawfully discriminated against as a result of his disability.  Rossbach v. City of Miami, 371 F.3d 1354,

12

1357 (11th Cir. 2004); Wood v. Green, 323 F.3d 1309, 1312 (11th Cir.

2003); Hillburn v. Murata Electronics of North America, 181 F.3d

1220, 1226 (11th Cir. 1999).   Once the plaintiff makes his *prima*

*facie* case the burden shifts to the defendant and he must

"articulate some legitimate, nondiscriminatory reason for the

employee's rejection." McDonnell Douglas Corp. v. Green, 411 U.S.

792, 802 (1973).   When the defendant produces a nondiscriminatory

reason the burden returns to the plaintiff, who must offer some

evidence to demonstrate that the defendant's proffered reason is

merely a pretext for a discriminatory motive.   Id. at 804.

A plaintiff may satisfy the first element of his *prima facie*
case by showing that he has "(A) a physical or mental impairment
that substantially limits one or more of the major life activities
. . . (B) a record of such an impairment" or that (C) he is
"regarded as having such an impairment."   42 U.S.C. § 12102(2)
(1990).   In the instant case Plaintiff alleges that he qualifies as
disabled under each of the three prongs.   (Compl. at ¶ 73, 78).   The
court will address each argument separately.

As noted above, to prove a disability under § 12102(2)(A), the

plaintiff must first convince the court that he has an impairment[11]

that substantially limits a major life activity.   Rossbach, 371 F.3d

at 1357.   A major life activity is a function "such as caring for

---

[11]   The Supreme Court recently noted that physical impairment, as
contained in the ADA, should be defined consistently with the definition
contained in the Rehabilitation Act regulations issued in 1977.   Toyota Motor
Mfg. v. Williams, 534 U.S. 184, 194 (2002).   The regulations define "physical
impairment" as "any physiological disorder or condition, cosmetic
disfigurement, or anatomical loss affecting one or more of the following body
systems: neurological; muscoskeletal; special sense organs; respiratory
including speech organs; cardiovascular, reproductive, digestive, genito-
urinary; hemic and lymphatic; skin; and endocrine."   45 C.F.R. §
84.3(j)(2)(i)(2001).   Defendants do not allege that Plaintiff's condition does
not fit this definition of impairment.

oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 45 C.F.R. § 84.3(j)(2)(ii) (2004). While this list is not exclusive, any unlisted activity "must be 'significant' to everyday life," to qualify as a major life activity. Rossbach, 371 F.3d at 1357 (quoting Bragdon v. Abbott, 524 U.S. 624, 638 (1998)). EEOC regulations define "substantially limited" as

> significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to . . . the average person.

29 C.F.R. § 1630.2(j)(ii) (2004).[12] When determining whether an impairment substantially limits an individual, the court should consider the impairment's: 1) "nature and severity;" 2) "duration or expected duration;" and 3) "permanent or long-term impact" or "expected permanent or long-term impact." §§ 1630.2(j)(2)(i)-(iii). The Supreme Court recently noted that the word "substantially" "suggests 'considerable' or 'to a large degree.'" Toyota Motor Mfg. v. Williams, 534 U.S. 184, 196 (2002). Thus, the Court reasoned that an impairment which only interferes with a major life activity in "a minor way" should not qualify as a disability under the ADA. See id. at 197.

In the instant case, there is no dispute that Plaintiff has an impairment resulting from a degenerative knee condition. However,

---

[12] The regulations also define "substantially limited" as "unable to perform a major life activity that the average person in the general population can perform." § 1630.2(j)(i).

14

because Plaintiff has failed to come forward with evidence by which a jury could properly conclude that his impairment substantially limits a major life activity, Defendants' motion for summary judgment is due to be granted.[13]  Plaintiff testified that his knee condition limits the amount of time, and manner in which, he sits, stands, walks and sleeps.  (Def. Ex. 1 at 109).[14]  Specifically, Plaintiff may not be able to sit or walk for more than "a few hours."  (Def. Ex. 1 at 117).  Plaintiff also testified that he felt discomfort within a hour after standing or walking and that it is

---

[13]  Plaintiff cites to DiPuccio v. U.S. Parcel Serv., 890 F.Supp. 688 (N.D. Ohio 1995), for the proposition that a knee condition such as Plaintiff's creates an issue of fact sufficient to survive summary judgment.  The DiPuccio court devoted only one paragraph to its analysis of the knee injury before it and concluded that summary judgment under the ADA was inappropriate.  Id. at 693.  Unlike the instant case, the plaintiff in DiPuccio presented the testimony of two medical professionals that his condition substantially limited him in a major life activity.  Id.  The defendant in DiPuccio produced evidence indicating that Plaintiff was not limited, as he purported to be, thus creating an issue of fact.  Id.  Here, Plaintiff presents no medical evidence and relies solely upon his own testimony.  Furthermore, there is no real dispute as to what Plaintiff's limitations are; rather the only dispute which exists is whether those limitations qualify as a disability.  This is a question of law, not one of fact and is properly resolved on summary judgment by the Court.  Finally, the DiPuccio decision was decided well before the Supreme Court's recent clarification of the "substantially limited" standard in Toyota Motor Mfg. Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), and therefore sheds little light on the present inquiry.

[14]  Plaintiff also offers evidence of work restrictions as prescribed by his doctor, which prohibit squatting or kneeling and limit his lifting to a maximum of 50 pounds.  These restrictions appear on a form labeled "Work Status Form."  (Ex. 26 to Def. Ex. 1).  Here, Plaintiff's inability to lift objects over 50 pounds in weight, or Plaintiff's inability to squat or kneel prohibit him from performing his job as a test-rider.  However, the evidence does not indicate that these restrictions interfere with "the central functions of daily life."  Mack v. Great Dane Trailers, 308 F.3d 776, 781 (6th Cir. 2002).  Accordingly, because Plaintiff's work related limitations are "occupation specific," Plaintiff may not rely on these restrictions alone as proof of a substantial limitation of a major life activity.  See id.  Likewise, Plaintiff may not successfully claim that he is substantially limited in the major life activity of "working" because to succeed Plaintiff must "show an inability to work in a 'broad range of jobs,' rather than a specific job."  Toyota, 534 U.S. at 200 (quoting Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999)).

painful to sit, stand, or kneel at church for "periods of time."[15] (Def. Ex. 1 at 521).

In the recent case of <u>Rossbach v. City of Miami</u>, the Eleventh Circuit addressed similar allegations. 371 F.3d 1354. In <u>Rossbach</u>, the plaintiffs, a group of policemen, alleged disability discrimination and claimed they were substantially limited by their inability to walk, sit, stand and sleep for "extended periods of time," and "long periods." <u>Id.</u> at 1359. One plaintiff even testified that he experienced difficulty sleeping nightly. <u>Id.</u> The <u>Rossbach</u> court initially noted that "other courts have consistently held that someone who walks, sits, stands or sleeps 'moderately below average' is not disabled under the Act." <u>Id.</u> (citations omitted).[16] The <u>Rossbach</u> court went on to characterize the plaintiffs' claims as being "couched in vague terms and unaccompanied by any evidence that the afflictions were any worse than is suffered by many adults." <u>Id.</u> Accordingly, the <u>Rossbach</u> court affirmed the lower court's finding that plaintiffs were not

---

[15] Plaintiff also testified that he experiences discomfort "at some point" after walking and that he sleeps with a pillow between his knees. (Def. Ex. 1 at 521). Furthermore, Plaintiff can't play raquetball or engage in long-distance running or jogging. (Def. Ex. 1 at 519).

[16] The <u>Rossbach</u> court paid particular attention to <u>Colwell v. Suffolk County Police Dept.</u>, 158 F.3d 635 (2d Cir. 1998), in which the Second Circuit "chastised plaintiff for engaging in 'hedging and studied vagueness' when describing his limitations." 371 F.3d at 1358. The <u>Colwell</u> court noted that that plaintiff in that case failed to show "that his affliction is any worse than is suffered by a large portion of the nation's population." 158 F.3d at 644. Notably, the <u>Colwell</u> plaintiff's description of many of his limitations are similar to the descriptions offered by Plaintiff in the instant case, and Plaintiff here has not offered any evidence from which the court can conclude that his afflictions exceed those of the average person. <u>Id.</u>

16

"substantially limited" as a matter of law.   Id.

Much like the Rossbach plaintiffs, Plaintiff here presents little evidence describing in detail the "nature and severity," the "duration of" or the "long-term impact" of his impairment.   §§ 1630.2(j)(2)(i)-(iii).   Furthermore, Plaintiff offers no evidence whatsoever that the difficulties he encounters are worse than those of the average population or amount to more than a moderate limitation.   Rossbach, 371 F.3d at 1358-1359.   As the Supreme Court has said, the language of the ADA must be "interpreted strictly" and the standard to qualify as disabled is a "demanding" one.   Toyota, 534 U.S. at 691.   As the Sixth Circuit recently explained, "an inability to perform 'occupation specific' tasks does not necessarily show an inability to perform the central functions of daily life."   Mack v. Great Dane Trailers, 308 F.3d 776, 781 (6th Cir. 2002).   In fact, Plaintiff admits to being able to perform many of the functions central to daily life.   For example, Plaintiff can drive a car[17], cook, clean, grocery shop, mow his lawn and perform many other typical daily activities.   (Def. Ex. 1 at 511-513). Accordingly, Plaintiff's evidence does not create a genuine issue of material fact and he is as a matter of law unable to present a *prima facie* case that he is substantially limited in a major life activity as required by § 12102(2)(A).

---

[17] Plaintiff does say he experiences some pain while driving but it does not prevent him from actually driving.  (Def. Ex. 1 at 511).

17

In addition to his allegations of a disability under §
12102(2)(A), Plaintiff also alleges that he is disabled because he
has "a record of such an impairment" as defined in subsection (B).
A plaintiff has a record of such an impairment when he "has a
history of, or has been misclassified as having, a mental or
physical impairment that substantially limits one or more major life
activities." § 1630.2(k).  Such a record may be contained in
various types of documents, such as educational, medical or
employment records.  Hillburn, 181 F.3d at 1229.  Under this
definition of disability, a plaintiff is still required to prove he
"actually suffered a physical impairment that substantially limited
one or more . . . major life activities." Id. Because the earlier
analysis indicates that Plaintiff cannot show he is substantially
limited in a major life activity, and because there is no
contention, much less evidence, that Defendant "misclassified"
Plaintiff, no reasonable jury could find Plaintiff disabled under
this theory of disability.

Though Plaintiff's brief does not address this theory, the
complaint alleges Plaintiff is disabled because Defendants regarded
him as having a disability.  § 12102(2)(C).  An employee is
"regarded as" being disabled if he

> (1) Has a physical or mental impairment that does not
> substantially limit major life activities but is treated by a
> covered entity as constituting such limitation;
> (2) Has a physical or mental impairment that substantially
> limits major life activities only as a result of the attitudes

18

of others toward such impairment; or
(3) Has none of the impairments defined in paragraph (h) (1) or
(2) of this section but is treated by a covered entity as
having a substantially limiting impairment.

§ 1630.2. Like a claim under § 12102(2)(A), under § 12102(2)(C), a plaintiff must show "that the perceived disability involves a major life activity and . . . is substantially limiting and significant." Rossbach, 371 F.3d at 1360.

Plaintiff does not specify what disability Defendants perceived him to have. Nonetheless, the evidence reveals that the only possible major life activity Defendants could have perceived Plaintiff to be limited in was his ability to work.[18] (Compl. at 10 ¶ 73); see Carruthers v. BSA Advertising, Inc., 357 F.3d 1213, 1217 (11th Cir. 2004). Even assuming that Defendants did perceive Plaintiff to be substantially limited in his ability to work (though the evidence does not clearly support such an assumption)[19],

_____

[18] At the time Defendants denied Plaintiff further employment as a test-rider and declined to provide his requested accommodation, Plaintiff admits the only restrictions Harley Davidson knew about were his doctor-prescribed limitations on squatting, kneeling and lifting. (Def. Ex. 1 at 510). Because Defendants were unaware of Plaintiff's difficulty walking, sitting, sleeping and standing, he may not successfully allege that Plaintiff perceived him as disabled as to any of these major life activities. See Carruthers, 357 F.3d at 1217.

[19] The cases of Carruthers and Rossbach are instructive as to what evidence is necessary for an employer to perceive a disability. In Carruthers, mere notice of a work limitation was deemed insufficient to infer that Plaintiff was perceived as disabled. 357 F.3d at 1217. In contrast, in Rossbach, the court concluded that because the police department permanently limited a group of officers to administrative work, they were perceived as substantially limited in their general ability to be officers. 371 F.3d at 1360. Plaintiff's evidence falls somewhere in between these two cases. Defendants' Exhibits 16-26 to Ex. 1 outline Plaintiff's work restrictions from June, 2001, until January, 2002. Defendants were certainly aware of Plaintiff's work limitations over this period and might have used this information to conclude he was substantially limited in doing his *particular*

19

Plaintiff must still show Defendants perceived him to be "unable to work in a broad class of jobs." Sutton, 527 U.S. at 491. Plaintiff offers no evidence to support such a conclusion.

On January 21, 2002, Wayne Sumners and Mary Jane Womack met with Plaintiff to discuss the availability of other jobs. (Def. Ex. 1 at 277-278). At the meeting, four open positions were discussed and Wayne Sumners determined that Plaintiff was either not qualified for any of the open positions or was unable to do the jobs because of his work limitations. (Def. Ex. 5 at 6). The fact that Wayne Sumners met with Plaintiff to discuss other openings at least indicates that Mr. Sumners thought Plaintiff might be able to fill another position. See McGeshick v. Principi, 357 F.3d 1146, 1151 (10th Cir. 2004). Even if Mr. Sumners did not think Plaintiff could fill any open job at Harley Davidson, the small number of jobs open at that time and offered to Plaintiff do not constitute a "substantial class of jobs." See Rossbach, 371 F.3d at 1361-62. Accordingly, no reasonable jury could find that Defendants "perceived" Plaintiff to be disabled in his ability to work.

Because Plaintiff has failed to make a *prima facie* showing of disability, this Court's analysis need go no further, and Defendants motion for summary judgment as to all ADA claims is due to be granted.

---

**job**. (Def. Ex. 5 at 4-5).

20

## PLAINTIFF'S DEFAMATION CLAIM

Under Alabama law, to succeed on a claim for defamation a plaintiff must make a *prima facie* showing of: 1) the publication; 2) of "a false and defamatory statement"; 3) of and concerning the plaintiff. <u>Nelson v. Lapeyrouse Grain Corp.</u>, 534 So.2d 1085, 1091 (Ala. 1988). The defendant's statement must have been at least negligent. <u>Id.</u> Furthermore, the plaintiff must show that the defamation was *per se*, meaning damages are presumed, or in the alternative prove special damages. <u>Id.</u> Slander *per se* imputes to a person "the commission of an indictable criminal offense involving infamy or moral terpitude." <u>Warren v. Birmingham Bd. of Educ.</u>, 739 So.2d 1125, 1132 (Ala. Civ. App. 1999).

In support of his defamation claim, Plaintiff presents the court only with his own deposition testimony that at some point in time between February of 2001 and March of 2002, Wayne Sumners told a representative of American Express that Plaintiff kept reimbursement checks for personal use. (Def. Ex. 1 at 366). Plaintiff offers no deposition testimony or affidavit of any employee of American Express or Nationwide Credit verifying that Mr. Sumners indeed made the alleged statements. Plaintiff himself admits to not being able to identify the person who informed Plaintiff of Wayne Sumners' alleged remarks. (Def. Ex. 1 at 366).

Evidence offered in support of summary judgment should consist of affidavits, depositions and pleadings "made on personal

knowledge," and "shall set forth such facts as would be admissible in evidence." FED. R. CIV. P. 56(c), (e).  Thus, if evidence is not admissible under the Federal Rules of Evidence it shall not be considered during summary judgment.  Plaintiff offers the out of court statements of unidentified American Express and Nationwide Credit employees for their truth - i.e. to prove Wayne Sumners actually made defamatory comments.  Consequently, the statements fall squarely within the definition of hearsay, are not admissible and will not be considered by this court on motion for summary judgment.  Macuba v. Deboer, 193 F.3d 1316, 1323 (11th Cir. 1999).

Because Plaintiff has no admissible evidence whatsoever to support his claim of defamation, there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law.

## PLAINTIFF'S FRAUD CLAIM

Under Alabama law, all causes of action based upon fraud are codified.  Intercorp, Inc. v. Pennzoil Co., 877 F.2d 1524, 1534 (11th Cir. 1989); see generally ALA. CODE §§ 6-5-100 - 6-5-104.  The various types include misrepresentation, suppression and deceit. Id.  To succeed on a fraud claim generally, a plaintiff must show

> (1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff, (4) who was damaged as a proximate result of the alleged misrepresentation.

Valley Properties, Inc., v. Strahan, 565 So.2d 571, 579 (Ala. 1990).

22

In addition, when a fraud claim "is based upon a promise to perform or abstain from performing in the future," it is called promissory fraud and the plaintiff must also prove (1) at the time of the fraud the defendant did not intend to complete the promised act and (2) the defendant intended to deceive the plaintiff.  Id.; see also Intercorp, 877 F.2d at 1534; ALA. CODE § 6-5-104(b)(4).

Plaintiff does not specify what type of fraud he alleges, and the language of the complaint is best described as "boiler plate." Regardless, an essential element of all types of fraud in Alabama is damage to the plaintiff.  ALA CODE § 6-5-100; Pihakis v. Cottrell, 243 So.2d 685, 688 (Ala. 1971).

Even assuming that Plaintiff can meet the first three elements of a fraud claim, his claim nonetheless fails because Plaintiff presents this Court with no evidence of actual damage.  It has long been established in Alabama law that "[d]amage to plaintiff" is "an essential element of actionable fraud."  Pihakis, 243 So.2d at 688; see also Southern Bakeries, Inc. v. Knipp, 852 So.2d 712, 716 (Ala. 2002).  Consequently, "fraud without damage, . . . gives no cause of action."  Einstein, Hirsch and Co. v. Marshall & Conley, 58 Ala. 153, 160 (1877).  Plaintiff presents the Court with no evidence proving that he has at the current time sustained any damages. Plaintiff himself admits that he was eventually fully reimbursed for all expenses accrued while traveling for Harley Davidson. (Def. Ex. 1 at 328; Def. Ex. 5 at 3).

23

Plaintiff contends that Harley Davidson's alleged fraud also caused him to accrue late fees and penalties for which he was never reimbursed. (Def. Ex. 1 at 327-328). Although this fact is undisputed, it is also undisputed that Plaintiff settled his account with American Express in July 2002 for $2,100. (Def. Ex. 1 at 453). Plaintiff received reimbursements from Harley Davidson totaling more than $4,000.00, which far exceeds the $2,100.00 Plaintiff paid to American Express. Accordingly, Plaintiff was not financially damaged in anyway, but actually gained a profit. (Def. Ex. 1 at 458-461). Because Plaintiff did not suffer any financial damage and does not present this court with evidence of any other type of damage he suffered as a result of Harley Davidson's alleged fraud, his claim fails.[20]

In sum, Plaintiff offers no evidence that the delay in his reimbursement or Harley Davidson's alleged fraud actually damaged him. Accordingly, there being no genuine issue of material fact, Defendants' Motion for Summary Judgment as to the fraud claim is due to be granted.

### Conclusion

In conclusion, the Court finds that no genuine issue of

---

[20] While Plaintiff claims relief in the form of punitive damages, under Alabama law, an award of punitive damages requires a showing "by clear and convincing evidence that the defendant consciously or deliberately engaged in oppression, fraud, wantonness, or malice with regard to the plaintiff." ALA.CODE § 6-11-20. Plaintiff offers no such evidence and thus may not recover punitive damages.

24

material fact exists as to Counts One, Two, Three and Five, and Defendants are entitled to judgment as a matter of law on each of these claims.   All claims over which the Court has original jurisdiction being disposed of, pursuant to § 1367(c) the Court declines to exercise supplemental jurisdiction over Count Four and dismisses Count Four without prejudice.   Consistent with the foregoing, separate final orders will be issued.

**DONE** this the $\underline{8}$ day of November 2004.

**VIRGINIA EMERSON HOPKINS**
UNITED STATES DISTRICT JUDGE